**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MARIA L. GUZMAN,
                Plaintiff,

      v.

CAROLYN W. COLVIN,
Acting Commissioner of Social
Security,

             Defendant.

) Case No. EDCV 15-0855 SS
)
)
)
)
) **MEMORANDUM DECISION AND ORDER**
)
)
)
)
)
)

**I.**

**INTRODUCTION**

    Plaintiff Maria L. Guzman ("Plaintiff") brings this action seeking to reverse the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner" or the "Agency") denying her application for disability benefits. The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. For the reasons stated below, the decision of the Commissioner is AFFIRMED.

\\

\\

## II.

### PROCEDURAL HISTORY

On May 4, 2012, Plaintiff filed an application for Disability Insurance Benefits ("DIB") (Administrative Record ("AR") 136) claiming that she became disabled on January 31, 2010. (AR 141). The Agency denied Plaintiff's application (AR 82-83) and she submitted a request for reconsideration on October 31, 2012. (AR 99). The Agency denied Plaintiff's reconsideration application on March 13, 2013. (AR 92). On April 26, 2013, Plaintiff requested a hearing before an administrative law judge. (AR 107). A hearing was held before Administrative Law Judge ("ALJ") Mark Greenberg on November 26, 2013. (AR 50). Plaintiff appeared with counsel and testified. (AR 50-75). Gloria Lasoff, an impartial vocational expert, also testified at the hearing. (AR 64-75). On December 6, 2013, the ALJ issued his decision denying benefits. (AR 6-24). On January 10, 2014, Plaintiff requested review before the Appeals Council. (AR 5). On February 23, 2105, the Appeals Council denied the request for review. (AR 1-4). On April 30, 2015, Plaintiff filed the instant action. (Dkt. No.) 1).

On November 5, 2015, Plaintiff filed a Memorandum in Support of Plaintiff's Complaint ("MSC"). (Dkt. No. 19). On February 4, 2016, Defendant filed a Memorandum in Support of Defendant's Answer ("MDA"). (Dkt. No. 24). On February 18, 2016, Plaintiff filed Reply in Support of Plaintiff's Complaint. (Dkt. No. 25).

\\
\\
\\

2

### III.

### FACTUAL BACKGROUND

Plaintiff was born on January 13, 1960. (AR 53). Plaintiff is single, the mother of three adult sons and has three grandchildren. (AR 61-62, 137). Plaintiff is a high school graduate and was previously employed as a child care director at World's Gym from 1994 until 2001, and as a nanny from 2003[1] until January 31, 2010. (AR 53, 161). On May 5, 2004, Plaintiff signed a "Compromise and Release" agreement regarding a Workers' Compensation claim against the gym where she worked. (AR 126-35). With regard to this agreement, Plaintiff alleged injuries to her "head, left shoulder and psych. [sic]." (AR 126). The gym disputed these allegations, noting that evidence of these injuries was lacking from Plaintiff's various medical evaluations. (AR 131). Nevertheless, the parties settled the dispute and Plaintiff received a lump sum payment. (AR 126).

Plaintiff testified that she was laid off from her nanny position on January 31, 2010 because "the economy got bad." (AR 54). January 31, 2010 is also the date Plaintiff identifies as the onset date of her disability. (AR 53, 154). Plaintiff testified that she "most likely" could have continued performing her nanny duties had she not been laid off, but that the progression of her symptoms would prevent

---

[1] There is some discrepancy as to when Plaintiff began work as a nanny. (Compare AR 193 (April 2005 through January 2010, Plaintiff worked as nanny at Palm Springs Welding) with AR 161 (2003 to 2010, working as nanny for business owner). Throughout this memorandum, the Court uses 2003, the date for her nanny position on the "Work History Report" approved by the Agency, as the date her employment as a nanny began. (AR 161).

3

her from presently performing those duties.   (AR 54).   Plaintiff testified that she experiences pain, stiffness, tingling in her extremities and other physical symptoms.   (AR 54-55).   On June 20, 2012, Plaintiff was involved in an auto accident that allegedly exacerbated her physical symptoms.   (AR 59, 264).

A.   **Plaintiff's Medical History**

   **1.   Physical Condition**

On November 28, 2011, Plaintiff was evaluated via diagnostic imaging for pain in the cervical, lumbar and thoracic spine.   (AR 253-55).   Imaging of Plaintiff's cervical spine revealed "loss of the normal lordosis consistent with muscle spasm," "2mm of spondylolisthesis of C4 on [illegible]," but that the "height of the vertebral bodies is maintained," and "no significant degenerative changes" were seen.   (AR 253).   Imaging of Plaintiff's lumbar spine revealed "[m]ild narrowing at L4/5," normal spinal alignment, and "no other significant degenerative changes."   (AR 254).   Imaging of Plaintiff's thoracic spine revealed "[d]egenerative changes at the upper and mid-thoracic levels," normal spinal alignment, and that the "height of the vertebral bodies is maintained."   (AR 255).

On December 28, 2011, Plaintiff's physician, Dr. Gita Tavassoli, examined Plaintiff.   (AR 215-16).   During this examination, Plaintiff rated the pain in her lower back "7" out of ten.   (AR 215).   Dr. Tavassoli noted normal curvature of Plaintiff's spine and full range of motion in her neck and back.   (AR 215).   Dr. Tavassoli noted that

4

the "[patient] wants to [illegible] lawyer work[er] compensation case." (AR 216). On May 6, 2012, Dr. Tavassoli again examined Plaintiff. (AR 201-03). During this examination, Plaintiff described her pain symptoms as "severe" with aggravating factors including "[l]ifting . . . and [t]wisting," with relief provided by "[h]eat/[c]old and [r]est." (AR 201). Dr. Tavassoli noted "[n]ormal range of motion, muscle strength and stability in all extremities with no pain on inspection." (AR 202).

Following Plaintiff's car accident on June 20, 2012, Plaintiff began a series of chiropractic procedures with Barry I. Nelson, a chiropractor, beginning on June 22, 2012 and ending on September 6, 2012. (AR 318-28). At the outset of these procedures, Plaintiff complained of "constant[,] sharp[,] severe" neck and lower back pain. (AR 323). Dr. Nelson noted "[p]atient states the . . . symptoms are directly attributable to the auto acc[ident]." (AR 323). When Plaintiff was asked if she noticed any "activity restrictions as a result of this injury," she replied "[y]es" and described the restrictions as "[e]verything." (AR 328). On August 17, 2012, Dr. Nelson completed a "Disability Slip," which indicated that Plaintiff was under his professional care, and had been placed on disability from "6/20/12 to 9/20/12." (AR 264).

On August 30, 2012, Dr. Tavassoli ordered that Plaintiff undergo a series of MRIs to evaluate her lower back pain and radiculopathy. (AR 271-74). The summary report indicated no loss of disc height or bulging of disc material at levels L2-L5, and that "vertebral heights are well maintained." (AR 271). Imaging of Plaintiff's lumbar spine

revealed "4mm of rightward bulging of disc material at L1-2" and "facet hypertrophy . . . at L3-4 and L4-5 and to a lesser extent L1-2." (AR 272). Imaging of Plaintiff's thoracic spine was "unremarkable." (AR 273). Imaging of Plaintiff's cervical spine revealed "less than 2mm of concentric bulging of the T2-3 disc," and "questionable minimal atrophy and encephalomalacia of the spinal cord posterior to C7 and T1." (AR 274). On October 4, 2012, Dr. Tavassoli again examined Plaintiff. (AR 280-82). During this examination, Plaintiff described her pain level as "8" out of ten. (AR 280). Dr. Tavassoli noted the worsening of Plaintiff's pain and referred her to a spine clinic. (AR 281). At a follow-up examination on October 30, 2012, Plaintiff described her pain as a "9" out of ten. (AR 290).

On November 13, 2012, Dennis Cramer, who appears to be a doctor of osteopathic medicine (AR 339), examined Plaintiff. (AR 337-39). Dr. Cramer noted Plaintiff's discomfort while walking and difficulty getting onto the examining table. (AR 338). However, muscle strength in Plaintiff's arms and legs were "5/5." (AR 337-38). Dr. Cramer recommended a series of three epidural injections to combat Plaintiff's reported pain. (AR 339). Dr. Cramer's overall medical impression was "L4 to S1 degenerative disc disease" and "[r]ight lower extremity radiculopathy." (AR 339).

On March 3, 2013, Plaintiff began a series of three epidural steroid injections which concluded on April 14, 2013. (AR 413-15). Plaintiff reported temporary pain relief due to these injections. (AR 413). On May 3, 2013, Dr. Cramer examined Plaintiff as a follow-up to the injections. (AR 336). During this examination, Dr. Cramer

noted "minor degenerative changes," with "no high-grade stenosis." (AR 336). Plaintiff's physical exam revealed "5/5 strength" in her extremities, normal reflexes and normal gait. (AR 336). Dr. Cramer explained to Plaintiff that "overall body pain" was "difficult to treat" and that her symptoms were consistent with fibromyalgia.[2] (AR 336).

On July 30, 2013, unknown persons evaluated Plaintiff at the "Center for Orthopaedic and Sport Excellence." (AR 341-53). This evaluation yielded results that are difficult to decipher. (AR 349-53). Plaintiff indicated that housework, prolonged sitting and "any activity" worsens her pain. (AR 345). Plaintiff noted that her back and neck pain was "worse" than it was thirteen months prior. (AR 345). Notes from the evaluation reveal that Plaintiff continued to work for three years after the 2001 injury she sustained at World's Gym. (AR 346). Notes also appear to indicate that pain from that injury was "resolved," and that Plaintiff was "currently applying for TTD."[3] (AR 346).

---

[2] The ALJ notes that Plaintiff's medical records do not "definitively" establish fibromyalgia. (AR 17). While she complains of pain, there is no medical record establishing that Plaintiff was evaluated using the recognized diagnostic methods for determining if a patient suffers from fibromyalgia. See Benecke v. Barnhart, 379 F.3d 587, 589 (9th Cir. 2004); Jordan v. Northrop Grumman Corp., 370 F.3d 869, 872 (9th Cir. 2004) (observing a generally accepted diagnostic test requires that a patient report pain in at least 11 of 18 tender points when palpitated by the examining physician's thumb). In addition, the only evidence to support the fibromyalgia finding is Dr. Cramer's statement in the "plan" section of his report that Plaintiff's symptoms are "consistent with fibromyalgia." However, the records omit any identification of a specific examination or diagnostic method he performed to reach this conclusion.

[3] "TTD" refers to "temporary total disability" benefits, which are payments made by the Agency while a worker recuperates away from work.

On October 2, 2013, Plaintiff underwent diagnostic imaging of her lumbar spine, thoracic spine and cervical spine. (AR 375-81). Imaging of Plaintiff's lumbar spine revealed "exaggerated lumbar lordosis," "facet sclerosis and hypertrophy at L5-S1 bilaterally," and well-maintained vertebral body heights and disc spaces. (AR 375). Imaging of Plaintiff's thoracic spine revealed "minimal spondylosis" and "minimal superior thoracic spine levoscoliosis." (AR 376). Imaging of Plaintiff's cervical spine revealed "mild degenerative facet sclerosis" and "hypertrophy from C3 through 7 bilaterally which appears progressive since 11/28/2011." (AR 380).

### 2. Vocational Expert Testimony

Vocational Expert ("VE") Gloria Lasoff testified regarding the existence of jobs in the national economy that Plaintiff could perform given her physical limitations. (AR 64-74). The VE testified that an individual with Plaintiff's age, education, experience and physical limitations would be able to perform light, unskilled work as a counter clerk. (AR 69-71). The VE noted that someone can be "off task" in such a job roughly five percent of the time and still maintain employment in that position. (AR 72). The VE testified that Plaintiff had "no transferable skills" which would qualify her for any sedentary work. (AR 73-74).

\\

\\

---

"Research: Workers' Compensation, Social Security Disability Insurance, and the Offset: A Fact Sheet" available at https://www.ssa.gov/policy/docs/ssb/v65n4/v65n4p3.html

### 3.   Plaintiff's Testimony

During the November 26, 2013 hearing, Plaintiff testified that her disability began January 31, 2010. (AR 53). Plaintiff noted that this is also the date when she was laid off as a nanny and home caregiver. (AR 53-54). Plaintiff testified that she could have continued this work notwithstanding being laid off, but that she presently is in too much pain to work. (AR 54). Plaintiff described her average pain level as a "six, seven, eight" out of ten. (AR 55).

Plaintiff testified that her daily activities include watching TV, reading, praying, and light cooking. (AR 56). Plaintiff testified that, under her doctor's recommendation, she walks around her neighborhood for about twenty minutes and swims "at least three times a week" during the summer. (AR 57, 60). Plaintiff lives alone and does a "little bit of laundry," and her sons help her with other household tasks like vacuuming, mopping and cleaning. (AR 56). Plaintiff testified that she can bathe herself, but notes that it is a "struggle." (AR 56). Plaintiff also testified that she lays down "on and off" for eight hours during a typical day. (AR 56, 58).

Plaintiff testified that she can go to the grocery store, but only does "light" shopping. (AR 57). Plaintiff stated that she tried looking for work, but that she couldn't stand or sit for "too long." (AR 62). When asked if she would be able to work a full eight hours with regular breaks, Plaintiff responded "[n]o." (AR 62).

\\
\\
\\

9

## IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[4] and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1)   Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2)   Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

(3    Does the claimant's impairment meet or equal one of list of specific impairments described in 20 C.F.R.

---

[4] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

Part 404, Subpart P, Appendix 1?  If so, the claimant
is found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing his past work?
      If so, the claimant is found not disabled.  If not,
      proceed to step five.

(5)   Is the claimant able to do any other work?  If not,
      the claimant is found disabled.  If so, the claimant
      is found not disabled.


Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262
F.3d 949, 953-54 (9th Cir. 2001) (citations omitted); 20 C.F.R.
§§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).


    The claimant has the burden of proof at steps one through four
and the Commissioner has the burden of proof at step five.  Bustamante,
262 F.3d at 953-54.  If, at step four, the claimant meets his burden
of establishing an inability to perform past work, the Commissioner
must show that the claimant can perform some other work that exists
in "significant numbers" in the national economy, taking into account
the claimant's residual functional capacity ("RFC")[5], age, education,
and work experience.  Tackett, 180 F.3d at 1098, 1100; Reddick, 157
F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  The
Commissioner may do so by the testimony of a vocational expert or by
reference to the Medical-Vocational Guidelines appearing in 20 C.F.R.
Part 404, Subpart P, Appendix 2 (commonly known as "the Grids").

---

[5] Residual functional capacity is "what [one] can still do despite
[his] limitations" and represents an "assessment based upon all of
the relevant evidence."  20 C.F.R. §§ 404.1545(a), 416.945(a).

11

Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert.  Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).

**V.**

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not under a disability within the meaning of the Social Security Act from January 31, 2010, through the date of the ALJ's decision on December 6, 2013.  (AR 19).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful employment since January 31, 2010.  (AR 11).  At step two, the ALJ found that Plaintiff had the severe impairments of degenerative disc disease, radiculopathy, facet disease and chronic pain with possible fibromyalgia.  (AR 11).  However, at step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).  (AR 13).  The ALJ noted that there is no medical listing for either chronic pain or possible fibromyalgia and that Plaintiff's impairments "considered singly and in combination, do not meet or medically equal the criteria of any medical listing." (AR 13).  The ALJ then found that Plaintiff had the following RFC:

> [Plaintiff] has the residual functional capacity to perform
> a range of light work as defined in 20 CFR 404.1567(b), and
> she could occasionally perform postural activities; she was
> precluded from climbing ladders, ropes, and scaffolds; she
> was precluded from concentrated exposure to vibration,
> extreme cold, and hazards; and she could frequently perform
> reaching, handling, and fingering.  In addition, since June
> 20, 2012, the claimant must have the option between sitting
> and standing after 20 minutes and she is limited to no more
> than occasional reaching, handling and fingering.

(AR 13).  In reaching this finding, the ALJ stated that he had considered all of Plaintiff's symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4b and 96-7p.  (AR 13).  The ALJ also considered evidence in accordance with the requirements of CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.  (AR 13).

In considering Plaintiff's symptoms, the ALJ first determined whether there were underlying medically determinable physical impairments that could be reasonably expected to produce Plaintiff's pain or other symptoms.  (AR 13).  The ALJ then evaluated the intensity, persistence and limiting effects of Plaintiff's symptoms to determine the extent to which they limited Plaintiff's functioning.  (AR 13).  Because the ALJ determined that Plaintiff's statements about the intensity, persistence, or functionally limiting effects of her pain or other symptoms were not substantiated by objective medical

13

evidence, the ALJ made a finding on the credibility of the statements based on consideration of the entire record.  (AR 13-14).

The ALJ stated that he doubted the credibility of Plaintiff's subjective pain allegations as compared to the objective medical evidence in the record.  (AR 14-17).  The ALJ discussed at length Plaintiff's description of her daily activities, functional limitations, and other actions which took place after the alleged onset date.  (AR 14).  The ALJ noted that Plaintiff had been laid off and continued to look for work after her alleged onset date.  (AR 14). The ALJ reported that Plaintiff received "routine, conservative and non-emergency treatment" since her alleged onset date and that her back pain was relieved by "heat/cold and rest," which suggested that Plaintiff's pain and limitations were not as severe as alleged.  (See AR 15).  The ALJ noted that Plaintiff's treatment in October 2011 revealed "unremarkable findings" and that Plaintiff had full range of motion in her spine.  (AR 15).  The ALJ also noted that Plaintiff was recommended to undergo physical therapy/occupational therapy and that she refused this treatment.  (AR 15).

The ALJ noted that, during another visit with her physician in May 2012, Plaintiff exhibited a full range of motion, muscle strength and stability in her all of her extremities.  (AR 15).  The ALJ also found that Plaintiff's examination on August 22, 2012--after her June 20, 2012 auto accident--continued to reveal "unremarkable findings." (AR 15).  The ALJ noted Plaintiff's continuing allegations of lower back pain, but emphasized that she remained on a conservative course of treatment prescribed by her physician.  (AR 16).  The ALJ then

discussed Plaintiff's November 12, 2012 orthopedic evaluation, which acknowledged Plaintiff's tenderness to palpation, decreased range of motion and pain in walking. (AR 16). However, the ALJ then noted her ability to walk without an assistive device, normal strength in her bilateral lower extremities, and normal sensation in her lower left extremity. (AR 16).

The ALJ summarized Plaintiff's May 2013 follow-up with her orthopedic surgeon as characterized by further "unremarkable findings." (AR 16). The ALJ noted the surgeon's findings of "only . . . mild degenerative changes with no evidence of high-grade stenosis," Plaintiff's full strength in her extremities, her normal gait and normal reflexes. (AR 16).

The ALJ found that Plaintiff's x-rays from October 2, 2013 revealed findings consistent with her x-rays from November 28, 2011-- before the date of her auto accident. (AR 16). The ALJ found that, despite Plaintiff's allegations of "all-over body pain," her May 2013 examination revealed further "unremarkable findings." (AR 17). The ALJ then noted that Plaintiff's October 2, 2013 x-rays belied her allegations of all-over body pain by showing no abnormalities in her pelvis, foot and hands. (See AR 17). The ALJ then dismissed the "disability statement" signed by Plaintiff's chiropractor as "brief, conclusory and inadequately supported by clinical findings." (AR 17). The ALJ also dismissed the disability statement signed by Plaintiff's primary care physician as unsupported by the record. (AR 17).

Finally, the ALJ noted the Agency medical consultants' findings, opining that Plaintiff could frequently "climb ladders, ropes, scaffolds, stoop, kneel, crouch, and crawl." (AR 17). The ALJ concluded that Plaintiff's "clinical presentation, type of and response to treatment, daily activities, and the objective evidence," did not support greater limitations than those found by the Agency. (AR 17).

At step four, the ALJ determined that Plaintiff was unable to perform any of her past relevant work as defined by 20 CFR 404.1565. (AR 17). However, the ALJ determined that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (AR 18). The ALJ, through the VE's findings, found that Plaintiff was able to perform to the requirements of "light work," with further limitations resulting from her additional symptoms. (AR 19). The VE testified that given all relevant factors, Plaintiff would be able to perform the requirements of "[c]ounter clerk" and "[f]urniture rental clerk." (AR 19). In sum, the ALJ found that Plaintiff was not under a disability as defined by 20 CFR 404.1520(g). (AR 19).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. "The court may set aside the Commissioner's decision when the ALJ's findings are based on legal

16

error or are not supported by substantial evidence in the record as a whole." Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457 (9th Cir. 1995)).

**VII.**

**DISCUSSION**

Plaintiff contends that the ALJ improperly rejected Plaintiff's subjective testimony regarding pain and functional limitations by failing to offer clear and convincing reasons for discounting her credibility. (MSC at 1-2). The Court disagrees. Accordingly, for the reasons discussed below, the ALJ's decision must be AFFIRMED.

**The ALJ Offered Clear And Convincing Reasons Supported By Substantial Evidence For Finding Plaintiff's Subjective Testimony Less Than Fully Credible**

The ALJ must make two findings before the ALJ can find a claimant's pain or symptom testimony not credible. 42 U.S.C. § 423(d)(5)(A) (explaining that "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability" absent additional findings). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)). Second, if the claimant has produced objective evidence, and the ALJ has not determined that the claimant is malingering, the ALJ must provide "specific, clear and convincing reasons" for rejecting the claimant's testimony regarding the severity of the claimant's symptoms. Id. (quoting Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir.1996)).

The ALJ may use "ordinary techniques of credibility evaluation" during this inquiry. Smolen, 80 F.3d at 1284. The ALJ may also consider any inconsistencies in the claimant's conduct and any inadequately explained or unexplained failure to pursue or follow treatment. Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008).

Here, Plaintiff introduced objective evidence of underlying impairments which could reasonably be expected to produce her pain.

However, the ALJ articulated specific, clear and convincing reasons for discounting Plaintiff's testimony about the severity of her pain. The ALJ appropriately cited discrepancies between Plaintiff's testimony and the objective medical evidence in the record. (AR 15-17). An ALJ may consider such inconsistencies as one factor, among many, bearing on the credibility of a plaintiff's subjective testimony. See, e.g., Thomas v. Barnhart, 278 F.3d 947, 958-60 (9th Cir. 2002) (ALJ properly considered the lack of objective medical evidence, as well as other factors, in evaluating the credibility of a plaintiff's subjective testimony regarding the severity of her impairments and pain); Morgan, 169 F.3d at 599-600 (same). The ALJ noted that "[c]onsidering the claimant's longitudinal clinical presentation, type of and response to treatment, daily activities, and the objective evidence," the limitations she described were not warranted. (AR 17).

The ALJ identified inconsistencies between Plaintiff's testimony and the objective medical evidence, which cast doubt on the physical limitations Plaintiff alleged.[6] The ALJ found that, on December 28, 2011, Plaintiff complained of lower back pain at a level of "7" out of ten, but her primary care physician reported full range of motion

---

[6] The Court notes that the ALJ omitted mention of at least one claim by Plaintiff that further calls her credibility into question: her testimony that she could only life "five or eight pounds." (AR 58). This testimony is contradicted by Drs. Tavassoli and Cramer who, on multiple occasions, noted that Plaintiff exhibited normal muscle strength. (AR 202, 206, 336, 337).

19

in her back and a "negative" straight leg raise[7] result.  (AR 215).
On May 6, 2012, Plaintiff again complained of severe back pain, but
her physician found "[n]ormal range of motion, muscle strength and
stability in all extremities."  (AR 202).  Plaintiff was involved in
a car accident which she alleged exacerbated her back and neck pain.
(AR 306).  Again, this allegation is contradicted by her physician's
finding that she had "[n]ormal range of motion, muscle strength, and
stability in all extremities with no pain on inspection."  (AR 306).

On May 3, 2013, an orthopedic specialist evaluated Plaintiff who
alleged overall body pain and "stabbing-like" pain in the back.  (336).
However, the orthopedic specialist noted "5/5" strength in Plaintiff's
extremities, normal gait, and only "[m]ild cervical, thoracic, and
lumbar spondylosis" with "no high-grade stenosis."  (AR 336).  In
October 2013, Plaintiff had her back x-rayed due to complaints of pain
and stiffness.  Imaging of her lumbar spine demonstrated "similar
findings" compared to x-rays done before her auto accident.  (AR 375).
Imaging of Plaintiff's thoracic spine revealed "minimal spondylosis"
and "minimal superior . . . levoscoliosis."  (AR 376).  Imaging of
cervical spine revealed only "mild degenerative facet sclerosis and
hypertrophy."  (AR 380).  These minimal findings undermine Plaintiff's
claims of severe, disabling pain.  As the ALJ found, these "clinical
presentations" were inconsistent with the degree of pain described by
Plaintiff.

---

[7] The "straight leg raise" test is commonly administered to rule in or
out disc herniation in the spine.  "Straight Leg Raise" available at
http:/www.physio-pedia.com/Straight_Leg_Raise_Test.

The ALJ also suggested that Plaintiff's pain was not as severe as alleged because she received "routine, conservative and non-emergency treatment" for her pain. (AR 15). Evidence of "conservative treatment" is generally sufficient to discount a plaintiff's testimony regarding the severity of their impairments. Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) (quoting Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995)). In her application, Plaintiff admitted that she was currently taking only Ibuprofen for pain. The court in Parra found "no error" by an ALJ discounting pain testimony when a plaintiff's ailments were being "treated with an over-the-counter pain medication." Id. at 750-51.

Plaintiff argues that her treatment should not be considered "conservative" because she received three epidural injections for pain. (MSC at 5-6). Despite reporting "temporary relief" from these injections, Plaintiff nonetheless chose not to continue these treatments nor did she seek other more aggressive treatments. A finding that treatment is sporadic is sufficient to discount a plaintiff's testimony. See Johnson, 60 F.3d at 1434 (affirming the ALJ's finding that gaps in medical treatment undermined the plaintiff's testimony of disabling pain). Furthermore, Plaintiff's primary care physician recommended physical therapy, which she refused. (See AR 227) ("Pt [sic] refuses PT[/]OT"). Indeed, "unexplained or inadequately explained failure" to follow a prescribed course of treatment weighs against a plaintiff's credibility. Tommasetti, 533 F.3d at 1039. Plaintiff's refusal to undergo doctor-recommended physical therapy, alongside her conservative course of treatment, diminishes her credibility.

The ALJ also noted that Plaintiff testified that she stopped working in January 2010 not due to disabling pain, but because she was laid off from her job. (AR 14); (see AR 54). Declining to work due to being laid off rather than injury is a "specific [and] cogent reason[]" to discount a plaintiff's testimony. Bruton v. Massanari, 268 F.3d 824, 828 (9th Cir. 2001) (holding that the plaintiff leaving his job because he was laid off rather than due to injury, inter alia, is sufficient to disregard the plaintiff's testimony). Additionally, the ALJ noted that Plaintiff admitted to looking for work after the alleged disability onset date. (AR 14, 62). Seeking employment after the onset of alleged disability is a clear and convincing reason to discount a plaintiff's testimony. Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009).

Finally, the ALJ cited Plaintiff's daily activities as an indication that her testimony was unreliable. (AR 14, 17). The ALJ noted that Plaintiff prepared meals, completed household chores, went grocery shopping, swam several days a week in the summer, and went on regular walks. (AR 14). While the Social Security Act does not require a plaintiff to be utterly incapacitated in order to receive benefits, it nevertheless would "not be farfetched" for an ALJ to conclude, based on a plaintiff's "ability to perform household chores and other activities," that a plaintiff's pain does not prevent her from working. Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (explaining that a plaintiff performing certain daily activities may demonstrate his ability to return to work.). After reviewing the ALJ's decision and based on the foregoing, the Court finds that the ALJ provided sufficiently clear and convincing reasons, supported by

22

substantial   evidence,   for   discounting   Plaintiff's   subjective
statements.

## VIII.

### CONCLUSION

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner. The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED: July 8, 2016

_____/S/_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE